UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INNA BEIM,

       Plaintiff,

vs.

HENRY FORD HEALTH SYSTEM,

       Defendant.

_____/

Civil Action No. 20-CV-13054

HON. MARK A. GOLDSMITH

## OPINION & ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 21)

Plaintiff Inna Beim brings this action under the Americans with Disabilities Act (ADA) against her former employer, Defendant Henry Ford Health System, for, allegedly, failing to accommodate her disability and retaliating against her after she requested accommodations.   This matter is now before the Court on Henry Ford's motion for summary judgment (Dkt. 21).   For the reasons that follow, the Court grants the motion.[1]

### I.   BACKGROUND

Beim was employed by Henry Ford as a Clinical Quality Facilitator from September 2016 until May 31, 2019.   HFHS Documents at HFHS208 (Dkt. 21-5).   She went on medical leave on January 30, 2019 to have surgery for a herniated cervical disk and recuperate.   She returned to work on April 22, 2019.   As explained below, Beim requested several pieces of office equipment to accommodate her disability; Henry Ford had provided or was in the process of providing each

---

[1] Beim filed a response (Dkt. 22), and Henry Ford filed a reply (Dkt. 28).   Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing.   See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).

of these requested items when Beim resigned on May 14, 2019.

### A. Accommodation Requests and Fulfillments

On March 13, 2019, while Beim was still out on medical leave, she texted her supervisor, Emily Nerreter, asking for a standing desk upon her return to work. HFHS Documents at HFHS394. The next day, Nerreter reached out to Henry Ford's Disability Management Coordinator, Lisa Carlisle, for direction. Id. at HFHS90. The following day, Carlisle told Nerreter that Beim needed to contact CIGNA, Henry Ford's third-party disability benefits provider. Id. That same day, Nerreter told Beim to contact CIGNA.

On March 19, after she contacted CIGNA, Beim called Nerreter, requesting a telephone headset and expressing her frustration that CIGNA had informed Beim that it would not have the equipment ready for her until after she returned to work, when an onsite assessment could be conducted. Id. at HFHS95. The following day, Nerreter emailed Carlisle for direction, copying Nerreter's supervisor, Colleen Savage. Savage told Nerreter to order a headset without CIGNA's involvement. Id. at HFHS96. Carlisle told Nerreter that even though CIGNA typically waits to conduct an onsite assessment until an employee has returned to work, Carlisle would work with CIGNA to try to do the assessment ahead of Beim's return. Id.

On April 4, Alexa McCartney, a CIGNA vocational coach, reported to Henry Ford that she had been in contact with Beim and was "waiting on additional medical information to determine next steps." Id. at HFHS100. On April 9, McCartney told Carlisle that she had received the additional medical documentation. Id. at HFHS103. McCartney stated that although it is CIGNA's standard practice to evaluate employees upon their return to work, she could process Beim's accommodation request before Beim's return. Id. McCartney recommended providing Beim not only with a standing desk, but also with a monitor mount. Id. at HFHS102. On April

2

11, Carlisle forwarded McCartney's recommendations to Nerreter, asking that Nerreter respond to McCartney.  Id. at HFHS103, 119.   Nerreter did so, and also suggested that Beim be provided with a second monitor.  Id. at HFHS119.   From April 17–18, McCartney, Carlisle, Nerreter, Savage, and a hospital administrator (Marilou Diaz) exchanged emails finalizing the equipment to be ordered.  Id. at HFHS 119–127.   The order was placed on April 18, and on April 19, McCartney e-mailed Nerreter and Diaz to inform them that the equipment had shipped and would arrive by the end of the day on April 22, Beim's first day back.  Id. at HFHS 126–127.  McCartney also called Beim to let her know that the standing desk would not be delivered by April 22.  Beim Dep. at 42–43 (Dkt. 21-3).  Nerreter told Beim that she could work from home on April 22.  Id. at 43.

When Beim went to work on April 23, the standing desk had been delivered but had not been assembled.  Id. at 46.   Beim contacted Maintenance and asked them to assemble the desk, which Maintenance did later that day.  Id.   Also on April 23, Nerreter informed Beim that she would receive the headset on April 25.  HFHS Documents at HFHS137.   Beim testified that when the headset was delivered to her on April 25, she asked IT to help her set it up, and she initially received no response.  Beim Dep. at 82–83.   Beim asked a few coworkers (who did not work in IT) to help her, but they all told her to contact IT.  Id. at 83.   Beim contacted IT again, but by "the time they repl[ied]," she was "so frustrated" that she called her husband, who came and set up the headset for her.  Id. at 84.

On April 24, Beim sent Nerreter an email asking for a more supportive desk chair.   HFHS Documents at HFHS137.   On that same day, Nerreter forwarded Beim's email to Carlisle, asking whether CIGNA could help process Beim's request.  Id. at HFHS135.   Carlisle told Nerreter to send the request to CIGNA.  Id.   Nerreter promptly emailed McCartney, asking her to review

3

Beim's request and provide a recommendation as to the chair.  Id. at HFHS138.  McCartney responded, letting Nerreter know that CIGNA would need to obtain pictures of Beim's workstation to review her current set up before approving any changes such as a new chair.  Id. at HFHS139. Kelton Winnega, a Human Resources employee at Henry Ford, took these pictures on April 26. Winnega Dep. at 14 (Dkt. 21-6).  He gave the pictures to Carlisle, who forwarded them to McCartney; McCartney informed Carlisle that she would "touch base with [Beim] . . . to schedule [her] ergonomic assessment."  HFHS Documents at HFHS149.  McCartney conducted the assessment on May 2.  Id. at HFHS463.  On May 7, McCartney recommended moving forward with obtaining a more supportive chair for Beim.  Id. at HFHS461.  Nerreter approved the recommendation the same day, id. at HFHS460, and McCartney told Beim that her request for a chair had been approved, Beim Dep. at 79.  McCartney placed the order, saying that she would try to expedite the shipping if possible.  HFHS Documents at HFHS458–459.

### B.  Resignation

Several days after Beim requested the new chair, Nerreter, Carlisle, and Winnega met to discuss Beim's status.  Carlisle and Winnega suggested that, in light of Beim's ongoing complaints of pain and need for the more supportive chair, Nerreter should speak with Beim regarding going back on medical leave until the appropriate accommodations were in place. Nerreter Dep. at 36 (Dkt. 21-4).  Beim testified that when she spoke with Nerreter, Nerreter told Beim that if she wanted the chair, she would need to go back out on medical leave.  Beim Dep. at 58–59.  Beim contends that Nerreter also told Beim that if Beim planned to stay, she would need to attend the off-site weekly staff meetings in person, id. at 141, meaning that Beim would need to drive to those meetings.  According to Beim, she was previously given the choice to attend these meetings either in person or by Skype.  Id. at 24.  Nerreter testified that she believed that Beim

4

could attend these meetings in person because Beim had not requested any driving-related accommodation.   Nerreter Dep. at 40.   Beim also testified that, during this meeting, Nerreter was condescending, mocking Beim's accent.   Id. at 78.   According to Beim, that was the only time that Nerreter was ever condescending to her.   Id. at 130.

After her meeting with Nerreter, Beim reached out to Savage, raising concerns about her conversation with Nerreter and Nerreter's condescending behavior.   Savage Dep. at 15 (Dkt. 21-7).   During this conversation, Savage told Beim that if she was not happy at Henry Ford, Beim was free to look for employment elsewhere.   Id. at 17.

Two days after Beim spoke with Savage, Beim complained to an employee, Karen Sparks, about how Nerreter and Savage had treated her.   Sparks took notes about this conversation and shared them with Savage.   HFHS Documents at HFHS168.   Savage then emailed Beim, asking her to submit her complaints in writing and reminding her to not discuss her complaints outside of Human Resources and her direct command, per the employee professional code of conduct.   Id. at HFHS172.   Beim submitted a written complaint on May 3.   Written Complaint (Dkt. 22-5). In this written complaint, Beim alleged that Savage threatened to write her up if she continued to complain to others about the handling of her accommodation requests.   Id.

On May 14, Beim told Nerreter that she was resigning, Beim Dep. at 91, and stated that May 31 would be her last day, HFHS Documents at HFHS208.   According to Nerreter, Beim told her that she was resigning because she had found another job.   Nerreter Dep. at 47.

After Beim resigned but before her last day of work, there were concerns that Beim was not following up with her teammates on the status of her deliverables.   Nerreter Dep. at 50.   Beim contends that on May 21, she was locked out of her work computer.   Beim Dep. at 112.   On that day, Nerreter met with Beim and told Beim that she would be paid through the end of the month,

but that Beim no longer needed to come to work.   Id. at 48.   Beim was escorted from the building

and told to not return.   HFHS Documents at HFHS239.   Beim received pay through May 31,

Nerreter Dep. 52, and her personal belongings were mailed to her.   Nerreter testified that Beim's

belongings were in good condition when they were mailed to her, id. at 74, but Beim testified that

one of her items—a sweater from her grandmother—was torn when it arrived, Beim Dep. at 119.

## II.  ANALYSIS

Henry Ford argues that it is entitled to summary judgment on Beim's failure-to-

accommodate claim and her retaliation claim.   Each claim is addressed in turn.[2]

### A.  Failure-to-Accommodate

The ADA prohibits discrimination "against a qualified individual on the basis of disability

in regard to . . . [the] terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).

Discrimination includes a failure to make "reasonable accommodations to the known physical or

mental limitations of an otherwise qualified individual with a disability . . . ."   Id. §

12112(b)(5)(A).   To establish a prima facie failure-to-accommodate claim, Beim must show that

(i) she was disabled within the meaning of the ADA; (ii) she was otherwise qualified for her

position, with or without reasonable accommodation; (iii) Henry Ford knew or had reason to know

about her disability; (iv) she requested an accommodation; and (v) Henry Ford failed to provide

the necessary accommodation.   Deister v. Auto Club Ins. Ass'n, 647 F. App'x 652, 657 (6th Cir.

---

[2] The Court applies the traditional summary judgment standard as articulated in Scott v. Harris,
550 U.S. 372, 380 (2007).   The movant is entitled to summary judgment if that party shows that
there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a
matter of law.   Fed. R. Civ. P. 56(a).   If the movant makes an initial showing that there is an
absence of evidence to support the nonmoving party's case, the nonmovant can survive summary
judgment only by coming forward with evidence showing there is a genuine issue for trial.
Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

2016).

Henry Ford argues that Beim cannot prove the fifth element because Henry Ford had provided Beim with—or was in the process of obtaining for Beim—all of the requested equipment (the standing desk, telephone headset, and supportive chair) when Beim resigned.   Mot. at 19. Beim contends that the fifth element is satisfied because Henry Ford failed to "timely" provide her with the requested equipment, as none of the equipment had arrived by Beim's first day back to work, and, when it did arrive, it was not immediately assembled.   Resp. at 14.[3]

An employer's unreasonable delay may constitute the denial of an accommodation.   See Tchankpa v. Ascena Retail Grp., Inc., 951 F.3d 805, 812–813 (6th Cir. 2020).   However, "employers need not immediately implement or accept accommodations proposed by an employee."   Id.   As a result, not just any delay can be considered unreasonable as a matter of law. See id. at 813.   In fact, "[a] relatively short delay of a few weeks (or even a few months) in approving a request typically does not support such a claim."   Marks v. Washington Wholesale Liquor Co. LLC, 253 F. Supp. 3d 312, 324 (D.D.C. 2017).   Ultimately, a delay in providing a reasonable accommodation is not actionable if "the delay is due to internal processing or to events outside the employer's control."   Gerton v. Verizon S. Inc., 145 F. App'x 159, 168 (6th Cir. 2005).

Beim attempts to frame the delay in Henry Ford's implementation of her requests for a standing desk and telephone headset as a multi-week delay; that is, Beim suggests the delay ran from the time that Beim requested these items while she was out on leave in March 2019 to when

---

[3] Beim's response brief references her written complaint, in which she stated that she asked Nerreter for "flexibility to work from home until everything get [sic] situated . . . ."   Written Complaint.   However, Beim failed to allege that she requested permission to work from home as an accommodation, see Compl. (Dkt. 1), and she does not argue in her response brief that the Court should consider her purported request to work from home as one of her requests for an accommodation.   Accordingly, the Court does not consider it.

Henry Ford provided the desk on April 23 and the headset on April 26.   Resp. at 14–15. However, because Beim requested these items for her use upon her return to work, there was no need for Henry Ford to implement these requests until Beim's return.   See, e.g., Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 737 (5th Cir. 1999) ("In this case, however, there was no apparent urgency in crafting accommodations since only a portion of Loulseged's duties presented difficulties and those duties were not yet imminent.").   Consequently, it makes no sense to count the time while Beim was still out on leave in the delay calculation.   Further, because the items were not set to arrive on Beim's first day back to work—April 22, 2019—she was permitted to work from home on that day.   Because Beim was permitted to work from home on her first day back, she did not need the office equipment on that day and, therefore, this day also arguably should not count towards the delay calculation.   The desk was delivered and set up the following day, and the headset was delivered and set up two days later.   As a result, the delay in implementing Beim's request for a standing desk and telephone headset from the time that they were actually needed—i.e., from either Beim's first day back to work (April 22) or her first day back in the office (April 23)—was a matter of days.   Further, the supportive chair was ordered within two weeks of Beim's request and was en route when Beim resigned a week after the chair was ordered.

Regardless of whether the delays in accommodating Beim's requests were a few days or a few weeks, courts have held that delays of similar or longer lengths are reasonable.   See, e.g., Newell v. Central Mich. Univ. Bd. of Trustees, No. 20-1864, 2021 WL 3929220, at *9 (6th Cir. Sept. 2, 2021) (holding, in the context of a Rule 12(c) motion, that a three-month delay in accommodating a plaintiff—caused by the defendant's internal processing of the plaintiff's civil rights complaint—was not unreasonable); Ellis v. North Andover Pub. Schs., —F. Supp. 3d—,

No. 19-11224-NMG, 2021 WL 5040330, at *4 (D. Mass. Oct. 29, 2021) (finding, on a motion for summary judgment, 16-day delay reasonable); <u>Marks</u>, 253 F. Supp. 3d at 325 (finding, on a motion for summary judgment, 17-day delay reasonable); <u>Anderson v. Bellsouth Telecommunications, LLC</u>, No. 2:12-cv-03537-RDP, 2015 WL 461698, at *11 (N.D. Ala. Feb. 4, 2015) (finding, on a motion for summary judgment, two-and-a-half-week delay reasonable); <u>Kintz v. United Parcel Serv., Inc.</u>, 766 F. Supp. 2d 1245, 1256–1257 (M.D. Ala. 2011) (finding, on a motion for summary judgment, 15-day delay reasonable); <u>Terrell v. USAir, Inc.</u>, 955 F. Supp. 1448, 1454 (M.D. Fla. 1996) (finding, on a motion for summary judgment, 3-month delay reasonable); <u>Hartsfield v. Miami-Dade Cnty.</u>, 90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000) (finding, on a motion for summary judgment, multi-month delay reasonable).

In addition to being short, the delays in implementing Beim's requests were entirely attributable to Henry Ford's diligent internal processing of each of Beim's requests and events outside of Henry Ford's control. When Beim asked Nerreter for a standing desk on March 13, Nerreter immediately sought direction on how to process Beim's request and, once she obtained this direction, initiated the process with CIGNA. Even though CIGNA typically waits to conduct an onsite assessment until an employee has returned to work, Carlisle worked with CIGNA to do the assessment ahead of Beim's return. McCartney waited on Beim to obtain the proper medical documentation and, once McCartney received it, she recommended a standing desk for Beim. McCartney and Henry Ford's personnel then worked to finalize the equipment order, which was placed several days before Beim returned to work. Because the standing desk's estimated arrival was the day after Beim returned to work, Beim was permitted to work from home on her first day back. The standing desk was delivered the next day (April 23) and set up by the end of that day.

When Beim asked Nerreter for a telephone headset on March 19, Nerreter again

immediately sought direction on processing the request.   She was told that the headset could be ordered without CIGNA's involvement, and so the order was placed.   The headset was delivered to Beim just two days after she returned to work in person (on April 25).[4]

Finally, when Beim asked Nerreter for a more supportive chair on April 24, Nerreter again immediately reached out to CIGNA to process Beim's request.   On April 26, Winnega took pictures of Beim's workstation, which CIGNA needed to process the request.   After communicating with Beim, McCartney conducted an ergonomic assessment on May 2.   The chair was ordered on May 7, just a week before Beim resigned.   The chair was still being shipped at the time of Beim's resignation.

Because Henry Ford acted expeditiously in providing each of Beim's requested items, there is no triable issue as to whether Henry Ford accommodated or was attempting to accommodate Beim when she resigned.   See Gerton, 145 F. App'x at 168.   As a result, Beim cannot prove this crucial element of her failure-to-accommodate claim.   Henry Ford is, therefore, entitled to summary judgment on this claim.[5]

## B.  Retaliation

The ADA separately prohibits an employer from discriminating against "any individual because such individual has . . . made a charge . . . under this chapter."   42 U.S.C. § 12203(a).

---

[4] Beim appears to complain that Henry Ford did not set up the phone for her.   However, Beim's own testimony indicates that Henry Ford was prepared to help her set up the phone but, due to Beim's frustration in not getting an immediate response from IT, she had her husband come to the hospital and set up the phone for her, within hours of receiving it.

[5] In addition to arguing that Henry Ford failed to accommodate her, Beim argues that she was constructively discharged by Henry Ford's failure to accommodate her.   Resp. at 18.   However, Beim is incorrect that Henry Ford failed to accommodate her, for the reasons discussed above. As a result, Beim cannot base her constructive discharge claim on a failure to accommodate her. It follows that this asserted adverse action cannot establish retaliation.

"Discrimination here means retaliation." EEOC v. Ford Motor Co., 782 F.3d 753, 767 (6th Cir.

2015). Thus, an employer violates the ADA if it retaliates against an employee for requesting a

reasonable accommodation. To establish a prima facie case of retaliation, Beim must show that

(i) she engaged in protected activity under the ADA, (ii) Henry Ford knew of that activity, (iii) she

suffered an adverse employment action, and (iv) there was a causal connection between the

protected activity and the adverse employment action. Morrissey v. Laurel Health Care Co., 946

F.3d 292, 304 (6th Cir. 2019). Henry Ford challenges Beim's ability to prove the second element.

Mot. at 21–24. Beim contends that she suffered an adverse employment action when she was

constructively discharged. Resp. at 18–19.[6]

A constructive discharge, if proven, is an adverse employment action. Scott v. The

Goodyear Tire & Rubber Co., 160 F.3d 1121 (6th Cir. 1998). "A constructive discharge occurs

when working conditions would have been so difficult or unpleasant that a reasonable person in

the employee's shoes would have felt compelled to resign." Tchankpa, 951 F.3d at 814. In other

words, Henry Ford "must have created an objectively intolerable work environment to deliberately

force [Beim] . . . to resign." Id. "[I]ntolerability is a demanding standard." Id. For instance,

---

[6] In her response brief, Beim argues that after her constructive discharge, "the retaliation
continued"—i.e., she was locked out of her computer, told to leave work, and her sweater was
returned to her in a damaged condition. Resp. at 19–20. An adverse action is one that constitutes
a "materially adverse change in the terms of or conditions of . . . employment because of [the]
employer's conduct." Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1107 (6th Cir.
2008). The challenged action must "constitute[] a significant change in employment status, such
as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a
decision causing a significant change in benefits." Redlin v. Grosse Pointe Pub. Sch. Sys., 921
F.3d 599, 607 (6th Cir. 2019) (punctuation modified). Because each of these actions were taken
after Beim resigned and did not result in a change in her benefits (notably, Beim was paid for the
period between when she was locked out of her computer and escorted off the premises on her last
formal day of work), they do not constitute a significant change in her employment status and,
therefore, are not adverse employment actions.

the United States Court of Appeals for the Sixth Circuit has held that demotion, reduction in salary, harassment, and sexual assault can be objectively intolerable working conditions.  Id.   However, "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Matvia v. Bald Head Is. Mgmt., Inc., 259 F.3d 261, 273 (4th Cir. 2001).

Beim is unable to meet this high standard.   Beim argues that after she complained about Henry Ford's failure to provide reasonable accommodations, the following events caused her to resign: (i) Nerreter's mocking of Beim's accent; (ii) Nerreter's suggestion that Beim go back on medical leave while her accommodation requests were being processed; (iii) Savage's statement that if Beim was not happy at Henry Ford, she could look for a job elsewhere; and (iv) Savage's alleged threat that Beim would be written up if she continued to complain about her interaction with Nerreter.   Resp. at 19.[7]   None of these events raises a triable issue of fact regarding constructive discharge.

First, Nerreter's mocking of Beim's accent may have been rude, but rude or condescending behavior is generally insufficient to compel a reasonable person to resign.   See Dendinger v. Ohio, 207 F. App'x 521, 527 (6th Cir. 2006) (concluding that supervisors' sexual overtures and condescending, rude, and mean treatment towards female employee were insufficient to prove

---

[7] In her Statement of Additional Material Facts (SAMF), Beim appears to complain that (i) Nerreter made her attend the weekly off-site meetings in person and (ii) Henry Ford failed to investigate her written complaint.   SAMF ¶¶ 6, 8 (Dkt. 22).   However, she does not raise these actions as adverse employment actions in the section of her brief pertaining to her retaliation claim. Accordingly, the Court need not address whether these alleged actions are adverse actions.   See Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 247 (6th Cir. 2007) ("In this circuit, it is well-settled that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.   It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (punctuation modified).

constructive discharge); <u>Jones v. Fitzgerald</u>, 285 F.3d 705, 716 (8th Cir. 2002) ("Constructive

discharge requires considerably more proof than an . . . unprofessional environment."). Rather, a

plaintiff must show that the offending behavior was sufficiently severe or pervasive to alter the

work conditions of her employment. <u>Penn. State Police v. Suders</u>, 542 U.S. 129, 144 (2004).

Here, Nerreter's condescending behavior consisted of allegedly mocking Beim's accent, which is

not sufficiently severe. <u>See, e.g.</u>, <u>Hanzer v. Nat'l Mentor Healthcare, LLC</u>, No.: 12-363-LPS-

MPT, 2014 WL 1390889, at *3 (D. Del. Apr. 10, 2014) ("Even a few incidents of mocking an

employee's accent does not rise to the level of a severe or pervasive hostile work environment.").

And—by Beim's own admission—this behavior was a one-time event, <u>see</u> Beim Dep. at 130

(testifying that Nerreter was never condescending to Beim on any other occasion), meaning that it

was non-pervasive, <u>see, e.g.</u>, <u>Williams v. AK Steel Corp.</u>, No. 18-11485, 2020 WL 2836287, at

*12 (E.D. Mich. May 31, 2020) (holding that a one-time use of a racial slur was not sufficiently

pervasive to support a hostile work environment claim).

Second, Nerreter's suggestion that Beim go back on medical leave until the appropriate

accommodations were provided is insufficient to establish constructive discharge. To be clear,

constructive discharge can occur where an employee is forced to take an unpaid medical leave of

absence from which the employee is unable to return. <u>See White v. Honeywell, Inc.</u>, 141 F.3d

1270, 1279 (8th Cir. 1998). But here, there was no suggestion that if Beim went back on medical

leave, it would be unpaid. Nor was there any suggestion that Beim would be unable to return to

work. To the contrary, Beim was only asked to go back on leave until the necessary equipment

has been provided. Nerreter Dep. at 36–37; Beim Dep. at 58–59. And Beim was not actually

forced to go back on medical leave, as she never took leave before resigning. The mere suggestion

that Beim go back on medical leave—in light of her complaints of pain and request for additional

13

equipment to accommodate her—would not have compelled a reasonable employee to resign.

Third, Beim is incorrect that she was constructively discharged because Savage told Beim that she should find another job if she was not happy at Henry Ford.   While an employer's conduct may amount to constructive discharge where the "employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated," this usually requires the employer to directly tell the employee that she will be terminated.   Lancaster v. City of Kalamazoo, 746 F.3d 714, 728–729 (6th Cir. 2014) (punctuation modified, citation omitted). This is because mere apprehension of future termination is insufficient to establish constructive discharge.   See Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002).   For instance, in Tchankpa, the employer told the employee that it might fire him if he violated its time off policy by seeking medical treatment during work hours; when the employee insisted on working from home, the employer reminded him that that "he could quit if he didn't like his job's requirements." 951 F.3d at 815.   The Sixth Circuit held that because the employer had previously rightfully denied the employee's unreasonable work-from-home request, the employer's forceful insistence that the employee accept its decision on his work-from-home request would not have compelled a reasonable employee to resign.   Id.   The court concluded that "[w]ithout the immediate or credible threat of adverse action, [the employer's] comments about [the employee] leaving his job did not create an objectively intolerable workplace."   Id.

This case is like Tchankpa.   The undisputed facts show that Savage did not tell Beim that she would be terminated for requesting accommodations or complaining about Nerreter's handling of these requests.   Rather, in the context of discussing Nerreter and Beim's conversation about Beim going back on medical leave, Savage told Beim that she was free to find another job if she was not happy at Henry Ford.   This at most was a strong reiteration of Henry Ford's lawful

14

suggestion that Beim go back on medical leave until her requested accommodations were secured. It was not an immediate or credible threat of termination.   As a result, Savage's statement that Beim was free to look for another job did not create an objectively intolerable workplace.

Fourth, even assuming that Savage threatened to write Beim up if Beim continued to complain to others, this is insufficient to support Beim's constructive discharge claim.   A reprimand can support a claim of constructive discharge in certain circumstances.   See, e.g., FiveCAP, Inc. v. N.L.R.B., 294 F.3d 768, 788 (6th Cir. 2002) (holding that reprimands for failure to comply with contrived policies supported constructive discharge claim).   But merely threatening an employee with a reprimand like a write-up is insufficient, see Tchankpa, 951 F.3d at 815 ("[R]eceiving negative feedback without consequence does not implicate the ADA."), particularly if the threat is not immediate, see id. (holding that a threat of termination is not objectively intolerable unless immediate); Agnew, 286 F.3d at 310 (holding that mere apprehension of an adverse action is insufficient to show constructive discharge).   Here, Beim has put forth no evidence to show that Savage's threat ever materialized (i.e., Savage never wrote up Beim).   Further, the record reflects that the threat was not imminent.   Rather, Savage threatened to hold Beim accountable if she continued to discuss her accommodation-related complaints outside Human Resources and her chain of command in violation of the employee professional code of conduct.   Savage Dep. at 25; HFHS Documents at HFHS172; Written Complaint; Beim Dep. at 74.   Thus, Savage's one-time threat of a write-up would not have forced a reasonable employee to resign.

No rational jury could conclude that Henry Ford made Beim's working conditions so objectively intolerable that any reasonable employee in her position would have felt compelled to resign.   The only rational conclusion is that Beim voluntarily resigned.   And a voluntary

15

resignation precludes a finding of adverse action, an essential element of Beim's retaliation claim.

<u>Hammon v. DHL Airways, Inc.</u>, 165 F.3d 441, 447–450 (6th Cir. 1999). As a result, Henry Ford

is entitled to summary judgment on this claim.

### III. CONCLUSION

For the foregoing reasons, the Court grants Henry Ford's motion for summary judgment

(Dkt. 21).

SO ORDERED.

Dated: November 18, 2021          s/Mark A. Goldsmith
       Detroit, Michigan              MARK A. GOLDSMITH
                                 United States District Judge